## UNITED STATES FIDELITY & GUARANTY CO. v. LOYD et al. (No. 3281.)*

(Court of Civil Appeals of Texas. Texarkana. Nov. 12, 1926. Rehearing Denied Nov. 25, 1926.)

1. Master and servant ⬤➞405(4)—Evidence held to sustain finding seller's employee, making adjustments, was in employer's service while driving tractor at request of buyer's driver.

Evidence *held* to sustain finding that motor company employee, after making adjustments on tractor, was engaged in employer's service, in attempting to drive it up inclined driveway onto platform at request of driver who had brought it to platform.

2. Trial ⬤➞232(2)—Court's explanation of special issue whether employee was performing voluntary act for accommodation of another held not error.

In proceeding involving question whether employee, when injured, was in the service of his employer, where court submitted special issue as to whether employee, when injured, "was performing a voluntary act for the accommodation of another," its added explanation that if employee was acting in furtherance of affairs of his employer jury should answer in the negative, though he may have acted voluntarily and for the accommodation of another, *held* not error.

Appeal from District Court, Upshur County; J. R. Warren, Judge.

Proceeding under the Workmen's Compensation Act by P. S. Loyd and another for the death of Paul Loyd, opposed by the Gilmer Motor Company, employer, and the United States Fidelity & Guaranty Company, insurance carrier. From an award of the Industrial Accident Board the insurance carrier appeals. Affirmed.

See, also, 278 S. W. 282.

Seay, Seay, Malone & Lipscomb, of Dallas, and Briggs & Davis, of. Gilmer, for appellant.
C. E. Florence, of Gilmer, for appellees.

HODGES, J. This suit was filed in the court below by appellant as an appeal from an award of the Industrial Accident Board. On June 16, 1924, Paul Loyd, an employee of the Gilmer Motor Company, was accidentally killed. His father and mother, appellees in this court, presented a claim to the Industrial Accident Board and were awarded $14.42 per week for 360 weeks. A provision was also made in the award allowing attorney's fees to be paid in weekly installments.

The principal question presented in this appeal is, Do the facts show that Loyd was killed while in the performance of a service for his employer? The jury found that he was, and, upon that finding, an appropriate judgment was rendered.

[1] The following are, in substance, the material facts proved on the trial: Approximately 60 days prior to the accident, the Gilmer Motor Company, who carried a policy with the appellant, had sold a Fordson tractor to one of its customers. It was understood between the buyer and the seller that the former was entitled to free service in the way of repairing defects that might develop during a period of 90 days after the sale. On the day of the accident Paul Loyd and other employees were engaged in unloading a shipment of Ford cars for the Gilmer Motor Company at the Cotton Belt depot in Gilmer. The railway platform used in loading and unloading freight at that place was elevated some distance above the ground and was approached by an inclined driveway. While Loyd and his associates were unloading and putting the new cars together, the tractor, previously referred to as having been sold by the Gilmer Motor Company, was driven to the platform and stopped at the foot of the inclined driveway. The tractor was driven by S. W. Ledbetter, an employee of the purchaser, for the purposes of being shipped to an oil field in Louisiana. After stopping the tractor at the foot of the driveway, the driver called Loyd's attention to some needed adjustment of the machine. It appears that the ignition system of the tractor was not in good working order. The engine was "missing," and there was a consequent loss of motor power. Loyd responded and made some adjustments about the coils and the carburetor, which apparently remedied the defects. He then undertook to drive the tractor up the inclined driveway to the platform. In the attempt, the tractor turned over and crushed his body so that he died in a short time thereafter.

Stracner, a witness for the appellant, testified:

"I saw Wess Ledbetter when he drove the tractor up there. He drove the tractor up and just run the front wheels up on the incline of this driveway, and the hind wheels of the tractor were against the abutment of the driveway, and he stopped it there in that position. When he stopped it, he just said to Paul: 'Paul, it is not running right; it won't pull nothing; I wish you would do something to it or adjust it—whatever it needs to have done to it. I wish you would look it over.' Paul Loyd then just went down by the side of the tractor, on the right-hand side. * * * Paul Loyd then put his foot up on some part of the tractor and just reached over in front of Wess. Wess hadn't got off of it at this time, and of course the motor was running, you know, and he reached over there and was fooling with something

or other, I don't know what it was, I suppose the carburetor or something, and at that time Wess got off of it. I was down there with them at that time. And Wess got off of it while Paul was fooling with it; and, when Wess got off, Paul just got over and sat down in the seat and was still tinkering with it. When he got in the seat, after he quit fooling with it, he taken off something, or was fooling with something directly in front of him. * * * Yes; it was missing when he was coming up. It quit missing after Paul worked with it awhile. Before Wess got off of the tractor, he asked Paul Loyd to fix that and drive it up there for him; and when he got off, while Paul was fooling with this—in this position that I am indicating—when he was standing up reaching over—when Wess got off he said: 'Go over there in that seat and drive that thing up there for me—I am new on the job—the first one I ever drive.' * * * No; Paul Loyd did not make any reply to that. When he quit working with it, then he made an effort to pull the driveway. * * * Just as soon as he got through adjusting this coil, or whatever it was that he was fooling with, why he made an effort to pull it. * * * I will say it was just about like any other man would be fixing a car; when he got his car fixed, as soon as he could get his gear shifted, or something like that, he would make an effort to start it."

Ledbetter, the driver of the tractor, testified that when he asked Loyd to make the adjustments, the latter did as he was requested and adjusted the carburetor and the coils. He said:

"After I got off of the tractor and after he [Loyd] sat down, the next thing he did was to drive it up there—started to. * * * I told Paul Loyd that it was my first day driving a Fordson tractor. When Paul started to drive this tractor up that incline was immediately after he got it to hitting. I don't know whether or not at the time he started to driving the machine up the incline he was then still attempting to adjust the carburetor or coil."

On cross-examination, he was asked if he had not signed the following affidavit on a previous occasion:

"The reason I asked Loyd to drive this tractor up the incline for me was that it was my first day on one of them, and I didn't know anything about it, and it wasn't hitting. But Loyd got it to working all right and then started to drive it up the incline for me, when it turned over and killed him."

In answer to that question the witness said:

"I suppose that is correct. Yes; that is just about what happened on that day, as near as I can remember."

Walter Cuba, another employee of the Gilmer Motor Company and who was present when the accident occurred, testified that he saw the tractor when it was approaching the platform, and discovered that it was missing. He was a mechanic and was familiar with tractors and their mechanism, and did not think it was possible to drive that machine up the incline in its impaired condition. He stated that at the request of Ledbetter Loyd did something to the carburetor and coils. In his cross-examination, he said:

"When Loyd got up on the seat he had his left hand around on the coils—around next to the coils—reaching around to the coils. Yes; it was hitting all right then—that is, it was better than it was; it was hitting better than it was. No; I did not see him when he put it in gear, and I don't know where his hand was when he put it in gear. Yes; the last time I saw him before the accident happened he had his left hand reaching around the coil. That was the last I saw of him, and it was then hitting better. No; I don't say that it was hitting all right. I don't know whether he was through then or not. I don't know just how long it was after I saw his left hand around at the coils till somebody said, 'Come here,' but no sooner than I just looked around and seen him and reached down to pick up a wheel, they hollered, 'Come here.' I don't say it was a half a minute. It was a short while. It wasn't long. I just reached down after a wheel, and when I reached down they hollered, 'Come here.' I guess it was something like half a minute."

When asked if mechanics usually run a machine after making adjustments to determine whether or not it is in good order, the witness answered:

"We always drive them; and the purpose for which they drive them is to tell when they have got it in proper adjustment—when they are hitting right."

Walter Gordon, who testified as an expert mechanic, said:

"I am informed that there has been considerable testimony in the record here about it being customary to drive a car after you have been working on it in order to determine whether it was in adjustment or not, and am asked if it is not a fact that mechanics usually and customarily drive the car or automobile around over different characters of ground to make that test; and answering I will say it is owing to what character of ground they have got right there, and what facilities they have right there to get a hard pull. If I had a place where I could get a hard pull I would take it. If I would find one where I could * * * I would not make a dangerous drive; I would try a hard pull."

The court submitted this special issue:

"Q. (1) Was the injury, from which Paul Loyd died, received by him while engaged in and about the furtherance of the affairs or business of his employer, the Gilmer Motor Company? Answer Yes or No." The jury answered, "Yes."

At the request of the appellant, this further question was propounded:

"Do you find and believe from the evidence that the deceased, at the time he sustained the injury that caused his death, was performing a voluntary act for the accommodation of one S. W. Ledbetter?"

In submitting that issue, the court gave with it this explanation:

"If the act referred to was in furtherance of the affairs or business of his employer, then you will answer said question, 'No,' though you may find it was done voluntarily and for the accommodation of S. W. Ledbetter. If it was not an act in furtherance of the affairs or business of his employer, and was a voluntary act for the accommodation of S. W. Ledbetter, you will answer said question, 'Yes.'"

The jury answered that question, "No"; and upon those answers the judgment was entered in favor of the appellees.

It was conceded that Loyd was acting within the scope of his employment in furtherance of his master's business while making the adjustments on the tractor, but the appellant contends that, in attempting to drive the machine thereafter, he departed from the line of his employment and voluntarily undertook a service for the sole accommodation of the driver. In view of the evidence concerning the custom of mechanics in testing machines after making such adjustments, it cannot be said that the finding of the jury that Loyd was engaged in his employer's service when injured is unsupported. The fact that this particular drive may have been undertaken partly to accommodate Ledbetter is not inconsistent with an intention on the part of Loyd to also make a trial test of the tractor.

The form of the first question submitted by the court was full enough to make an answer either way decisive of the controlling issue of fact presented by the pleadings and evidence. The statute provides that insurers, under the provisions of the Workmen's Compensation Act (Acts 35th Leg. [1917] c. 103, pt. 4, § 1), shall be responsible for all "injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employé while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

If, while attempting to drive the tractor, Loyd was continuing a service for his employer, there can be no doubt that the injury he received was one coming within the terms of the statute. There is no merit in the objection that the special issue should have been differently worded.

[2] Appellant complains of the explanation or qualification which the court gave in connection with the second interrogatory propounded to the jury. The request for an issue to be submitted in that form is justified by the appellant upon the ground that it was entitled to have its special defense affirmatively submitted for the consideration of the jury. The pleading presenting that defense is as follows:

"And further specially pleading herein, this defendant denies that the said Paul Loyd at the date alleged was acting in the course of his employment, or that his injuries arose out of and were sustained in the course of his employment, but alleges, on the contrary, that if the said Paul Loyd sustained any injury which resulted in death, which it does not admit but here expressly denies, then and in that event it alleges that such injury was sustained while he was performing a voluntary act wholly outside of the course of his employment, and merely for the accommodation of Ledbetter."

The substance of this pleading, beyond the special denials it contains, is that Loyd was voluntarily performing a service wholly outside of his employment, for the accommodation of Ledbetter. The interrogatory, as formulated and requested by appellant, did not conform to its pleading. It omitted the essential terms "wholly outside of the course of his employment, and merely," etc. The interrogatory was given precisely as formulated by the appellant, and the effect of the court's qualification was to furnish a guide by which to determine the legal effect of the categorical answer called for.

In the trial, no objection was made to the qualification on the ground that it was in the nature of a general charge and should not have been injected into a case submitted on special issues.

The judgment will be affirmed.